Hearing Date: 10/27/2022 9:30 AM
Location: Court Room 2402
Judge: Price Walker, Allen

**12-Person Jury**

FILED
6/29/2022 10:30 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH06258
Calendar, 3
18481154

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – CHANCERY DIVISION

| | | |
|---|---|---|
| GEORGE TSITIRIDIS, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  **2022CH06258** |
| NUKA ENTERPRISES, LLC, | ) ) ) | |
| Defendant. | ) | Jury Trial Demanded |

## CLASS ACTION COMPLAINT

Plaintiff GEORGE TSITIRIDIS, individually, and on behalf of all others similarly situated ("Plaintiff"), by and through counsel at Zimmerman Law Offices, P.C., brings this action against Defendant NUKA ENTERPRISES, LLC ("Defendant"), as follows:

### PARTIES

1.    Plaintiff is a natural person and citizen of the State of Illinois.

2.    Defendant is a limited liability company organized under Delaware law, with a principal place of business at 9690 Dallas Street, Unit 1A, Henderson, Colorado. Defendant manufactures, markets, advertises, distributes, and sells cannabis products at licensed dispensaries in Arizona, Colorado, Illinois, Massachusetts, Michigan, and Oklahoma through its trade name, 1906 Edibles, including 1906 Edibles Midnight Drops (the "Products").

### JURISDICTION AND VENUE

3.    This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a)(1) (transaction of any business within this State), section 735 ILCS 5/2-209(a)(2) (committing a tortious act within this State), section 2-209(a)(7) (the making or performance of any contract or promise substantially connected with this State), section 2-209(b)(4) (corporation

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

doing business within this State), and section 2-209(c) (any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States).

4.     Venue is proper in this County pursuant to 735 ILCS 5/2-101, because many of the acts and transactions giving rise to this action occurred in this County. Defendant (a) is authorized to conduct business in this County and has intentionally availed itself of the laws and markets within this County through the distribution and sale in this County of the Products at issue in this case; (b) conducts substantial business in this County; and (c) is subject to personal jurisdiction in this County.

## ILLINOIS CANNABIS REGULATION AND TAX ACT

5.     Illinois became the first state to legalize the recreational use of cannabis through legislation (rather than ballot initiative) when it enacted the Cannabis Regulation and Tax Act ("Cannabis Act"), 410 ILCS 705/1, *et seq.*, which went into effect on January 1, 2020.

6.     The Cannabis Act closely regulates the cultivation and sale of cannabis products in Illinois, and delegates authority to the Illinois Department of Agriculture to oversee and regulate the cultivation of cannabis in Illinois. *See* 410 ILCS 705/55-5.

7.     All cannabis and cannabis-infused products that are sold in Illinois are sourced from cannabis cultivated in Illinois, and cannabis-infused products are manufactured and processed in Illinois. As conditions of obtaining an Infuser License under 8 Ill. Admin. Code 1300.400, all principal officers expressly agree to be subject to service of process in Illinois and to maintain a current Illinois address on file with the Illinois Department of Agriculture. *See* 8 Ill. Admin. Code 1300.400(31).

8.     Under section 55-20(a) of the Cannabis Act, advertising that contains any statement or illustration that "(1) is false or misleading; . . . [or that] (5) makes any health, medicinal, or

2

therapeutic claims about cannabis or cannabis-infused products" is prohibited. 410 ILCS 705/55-20(a)(1), (5).

## 1906 EDIBLES MIDNIGHT DROPS

9. Defendant manufactures, markets, advertises, distributes, and sells the Products in Arizona, Colorado, Illinois, Massachusetts, Michigan, and Oklahoma. The Products are reportedly coming soon to Ohio. All Products sold in each of these states are cultivated, infused with cannabis, and distributed within the state of sale.

10. Defendant's website, https://1906newhighs.com, allows consumers to pre-order the Products to pick up at a dispensary in the states where the Products are available, including Illinois. Customers may also purchase the Products at a dispensary in the six aforementioned states without pre-ordering them from Defendant.

11. Defendant's marketing strategy for the Products mimics pharmaceutical advertising, and pitches cannabis as "medicine."[1] Defendant represents that the Products "help you fall asleep because of its sedative properties, and it helps you stay asleep because it targets body pain and tension, including acute, inflammatory, and neuropathic pain."[2] Defendant represents that the Products are "great for:" "anyone struggling with sleep" and "a good night's sleep without depending on habit-forming prescriptions."[3] Defendant's stated "mission is to give people access to cannabis and plant-based medicines that offer a powerful, safe and effective alternative to these

---

[1] https://www.rollingstone.com/culture/culture-features/legalizing-pot-new-jersey-marijuana-market-worldwide-729678/

[2] https://1906newhighs.com/products/midnight/

[3] *Id.*

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

products."[4] The Products are packaged in a cylindrical tube, resembling a prescription drug container. The Products themselves come as "drops" that resemble pills in size, shape, texture, and appearance. They are meant to be swallowed and not chewed.

12.    Defendant often refers to its products as pills. In an interview with Forbes on June 12, 2020,[5] Peter Barsoom ("Barsoom"), Defendant's founder and CEO, explains:

> We created 1906 Drops—fast-acting pharma-grade pills combining cannabis and other medicinal plants—to help people treat their concerns and enhance their wellbeing. The predominant way that Americans take medicine is in pill form. It could be a pill for anxiety, a pill for sleep, or a pill for arousal. It was always odd to me that cannabis, which can effectively address all these things, wasn't available in pills. So, after years of R&D, we launched Drops in six formulas (for sleep, sex, anxiety, energy, focus and bliss) and moved cannabis into the medicine cabinet. They kick in within 20 minutes—an absolutely crucial innovation for making cannabis accessible for daily use.

13.    On Defendant's website, https://1906newhighs.com/products/midnight, Defendant touts the Products as an all natural sleep aid:

> Midnight . . . is 1906's best-selling product, and there is good reason: it really works. It's become legendary among cannabis-industry professionals as the best sleep aid on the market, both in dispensaries and mainstream pharmacies. Midnight is a highly targeted blend of sleep-inducing plant medicine and relaxing cannabis that promotes deeper and more restful sleep. Midnight's key ingredient, Corydalis, has been used for millennia and works in several crucial ways. It helps you fall asleep because of its sedative properties, and it helps you stay asleep because it targets body pain and tension, including acute, inflammatory, and neuropathic pain.

14.    On Defendant's website, https://1906newhighs.com/products/midnight, in prominent text, graphically designed to be noticed, the following features are emphasized: Rapid

---

[4] https://www.kahnerglobal.com/single-post/interview-with-peter-barsoom-nuka.

[5] https://www.forbes.com/sites/warrenbobrow/2020/06/12/peter-barsoom-co-founder-and-ceo-of-luxe-cannabis-brand-1906/?sh=55132624424b.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

Onset, Safe & Effective, Sustainable Packaging, Pharma Grade, Portable & Discreet, Calorie-, Gluten-, Sugar-, & Dairy-Free.

15.    The Products' packaging is shown below, with the product description and specifications displayed.



16.    According to the Products' package labeling, each serving size of the Products contains 100 milligrams (mg) of "Corydalis rhizome extract (Corydalis yanhusuo)" and 10 mg of "Cannabis extract."



17.     Although the Product information contains certain disclaimers regarding the use of cannabis, there are no warnings or disclaimers regarding the 100 mg of Corydalis or its effects on the human body if used regularly and as intended by Defendant.

## CORYDALIS AND ITS CONSTITUENT INGREDIENT TETRAHYDROPALMATINE ("THP") CAUSE LIVER DAMAGE

18.     Corydalis (Corydalis yanhusuo) is a relative of the poppy. It is native to many regions in the Northern hemisphere. Corydalis contains tetrahydropalmatine ("THP"). THP is naturally present in Corydalis yanhusuo.

19.     Corydalis and THP are not used in conventional medicine. Reliable, comprehensive scientific studies support a causal connection between Corydalis and THP and hepatotoxicity (*i.e.*, hepatitis, liver damage, or liver disease). Corydalis is known to produce immediate side effects, including nausea and fatigue, in some people. Use of products containing THP has repeatedly been associated with severe and potentially fatal liver injury.[6]

20.     The causal connection between THP and liver damage is so well-documented that some governments regulate THP and Corydalis, or have banned them altogether, because THP is known to cause liver damage. For example, herbs containing THP, such as Corydalis, have been banned from 1995 to 2018 by the Ministry of Health of Singapore. Even after it was legalized in Singapore, it can only be purchased from licensed distributors and its use is limited to 19 mg of THP per day, because there is "evidence of an association between high levels of THP and liver toxicity in scientific literature."[7]

---

[6] https://www.cancercarewny.com/content.aspx?chunkiid=104681#:~:text=The%20herb%20is%20known%20to,and%20potentially%20fatal%20liver%20injury.

[7] The Straits Time, HAS to life ban on Corydalis yanhusuo herb after more than 20 years (Feb. 25, 2018), available at https://www.straitstimes.com/singapore/health/hsa-to-lift-ban-on-Corydalis-yanhusuo-herb-after-more-than-20-years.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

21.    According to the Western New York Urology Associates, "there is no reliable evidence that Corydalis or its constituents offer any medicinal benefits." In addition, "Corydalis has not undergone any meaningful safety testing." Thus, the urologists "strongly recommend against the use of corydalis" because "use of products containing THP has repeatedly been associated with severe and potentially fatal liver injury."[8]

22.    Numerous reports and studies conclude that there is a causal connection between Corydalis or THP and liver injuries, including:

- The Korean Journal of Hepatology published a case study connecting the use of Corydalis to liver injury in a healthcare patient suffering from jaundice[9] and abdominal discomfort. The authors concluded the patient suffered from "hepatotoxicity induced by Corydalis."[10]

- Another article describes two patients who suffered severe hepatitis (inflammation of the liver), one of whom died, after taking Chinese herbal remedies for minor complaints. An herb containing THP (Jin Bu Huan) was explicitly implicated.[11]

- Another study provides metabolic evidence of THP involvement in nine adult cases of acute THP intoxication causing liver injuries. The authors noted "the reported

---

[8] https://www.wnyurology.com/content.aspx?chunkiid=104681#.

[9] Jaundice occurs when the diseased liver fails to remove enough bilirubin from the blood.

[10] The Korean Journal of Hepatology, 01 Dec 2009, 15(4):517–523, available at https://europepmc.org/article/med/20037271.

[11] McRae C.A., Agarwal K., Mutimer D., et al. Hepatitis associated with Chinese herbs. *Eur J Gastroenterol Hepatol.* 2002; 14:559–62.

FILED DATE: 6/29/2022 10:30 AM 2022CH06258

toxic effects of THP include...acute or chronic hepatitis after regular use in adults."[12]

23.     On December 3, 1993, the United States Centers for Disease Control and Prevention ("CDC") connected three patients experiencing symptoms of acute hepatitis, jaundice, and elevated liver test results to a single product (Jin Bu Huan), which was shown by nuclear magnetic resonance and gas chromatography to contain 28.8 mg of THP. The CDC noted that THP is a chemical present in Corydalis.[13] As a result of the CDC's investigation, THP was entered into the update of Poisindex Registered, an international toxicologic database.[14]

24.     An article published at the website https://PotGuide.com reported several cases of liver damage connected to the Products. Katie Stem, a nationally certified and state-licensed Chinese herbalist, states that Corydalis should not be used for sedation, and that administering doses of Corydalis at 100 mg per pill is a "terrible idea."[15]

25.     The same PotGuide.com article reports the case of Meryl Jones Williams, who took the Products occasionally for about six months. One day she awoke feeling nauseous and winded with abdominal pain. Ms. Williams went to urgent care with acute jaundice. In an Instagram post,

---

[12] Chi-Kong Lai, Albert Yan-Wo Chan, Tetrahydropalmatine Poisoning: Diagnoses of Nine Adult Overdoses Based on Toxicology Screens by HPLC with Diode-Array Detection and Gas Chromatography–Mass Spectrometry, *Clinical Chemistry*, Volume 45, Issue 2, 1 February 1999, Pages 229–236, at https://doi.org/10.1093/clinchem/45.2.229.

[13] United States Center for Disease Control and Prevention, MMWR, December 03, 1993, 42(47); 920–922.

[14] United States Center for Disease Control and Prevention, MMWR, August 27, 1993, 42(33); 633-636.

[15] Paul Barach, Corydalis in 1906 Edibles Called into Question for Health Risks, PotGuide.com, April 1, 2022, available at https://potguide.com/blog/article/Corydalis-1906-edibles/

she later wrote, "After a week in the hospital, various tests, and nearly experiencing liver failure with an otherwise healthy liver—it was discovered I suffered an herbal drug induced liver injury from the Chinese herb Corydalis."[16]

26.    Defendant has recently acknowledged that there are potential ill effects of Corydalis. Specifically, Defendant recently amended its website listing for the Products to note in inconspicuous text that "this product contains Corydalis," "Corydalis may cause serious health problems" and "should be taken in consultation with a physician."[17] This inconspicuous statement is a recent addition to Defendant's website. However, a mere warning is insufficient and unreasonable given the high risk that the Products will cause liver damage to users when used as intended and directed.

27.    The PotGuide.com article makes clear that Defendant is, and for years has been, aware of complaints regarding the Products' adverse effects on the liver. Barsoom admitted that, over the past five years, he has been contacted by consumers who consumed the Products and suffered liver damage similar to that experienced by Ms. Williams.[18] Despite this knowledge, Defendant continues to tout Corydalis as a treatment *for* liver injuries, asserting that "[t]he current surge of interest from researchers has further begun to explore the therapeutic potential of THP for breast cancer, heart attack, liver damage, and stroke."[19]

---

[16] *Id.*

[17] https://1906newhighs.com/products/midnight/

[18] Paul Barach, Corydalis in 1906 Edibles Called into Question for Health Risks, PotGuide.com, April 1, 2022, available at https://potguide.com/blog/article/Corydalis-1906-edibles/

[19] https://1906newhighs.com/news/12-days-of-plant-medicine-on-the-seventh-day/

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

28.    The unreasonably high levels of Corydalis extract and THP contained in the Products are the cause of the liver damage and other injuries sustained by Plaintiff and members of the Multistate Consumption Class and Illinois Consumption Subclass. The Products are unreasonably dangerous, harmful, and unsafe for human consumption.

29.    Comments obtained from numerous internet forums and customer review pages illustrate the widespread harm inflicted on users of the Products. A sampling of these complaints appear below:[20]

### Comments from Potguide.com[21]

- Kim — I too have had experienced extremely high liver enzymes (they got up to 1125 ALT when normal is 50 or below) Multiple blood tests and liver scans till I pin pointed myself the Corydalis ingredient that you CAN BARLEY read on the bottle as "other ingredients " . Extreme fatigue, nauseous and just generally feeling awful for months now I have taken them for only a few short months, I am a fitness instructor and fanatic and cannot even finish a workout now due to being so tired and trying to get my enzymes down to a normal range . This is truly awful they can keep this product out there with no instructions or warnings on the bottle. Yes it puts you to sleep its AMAZING !!!! Too good to be true ... (and unfortunately it is) as I know face awful health problems. I wish I would have never walked into that store. I am going to try and find some help to see if and where these types of products can be pulled off the shelf before someone actually dies form this.

---

[20] In order to maintain the comments as true and accurate, all comments are transcribed verbatim without any edits or corrections.

[21] https://potguide.com/blog/article/corydalis-1906-edibles/#comments.

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

- Marci — I have been going through tests, ultrasound, MRI, Liver biopsy for last few months and have been diagnosed with drug induced liver damage. The ONLY thing i have been taking is the 1906 Midnight pills periodically. This is scary shit and needs to be investigated further and shouted from the rooftops to others.

- Prentice — I just got out of the hospital with liver damage out of nowhere. Extreme nausea, fatigue and excruciating abdominal pain. The liver damage is consistent with alcoholic type issues and I am not a drinker. The only thing I've changed in my life is the 1906 pills I was taking for sleeping. I'm miserable now. I wish I would have known sooner. :(

- Kate Pistone — I found out that I had insanely elevated liver enzymes after taking Midnight Drops for less than 6 weeks. I did not take every night either. Only because I had routine blood work scheduled did I learn what was happening to my liver before I also suffered serious damage. I am now going 6 weeks with not even a Motrin with periodic tests to get levels back within normal range. I can't believe they are allowed to keep these on the market.

- Jason — I recently have been suffering from gastrointestinal issues (abdominal pain, nausea, gas). After seeing my doctor, blood tests revealed mildly elevated liver enzyme ALT (61 when 50 is the normal high). After some research, I found the link between corydalis, 1906 Midnight pills, elevated ALT, liver injury, and the associated gastrointestinal issues. I had been taking these pills every night for a few months (and they were working great for sleep), but I am so glad I caught this before it became a bigger issue. I too find it crazy the Corydalis dosage used (100 mg when 5-10mg is recommended!) in super tiny print when it appears to be known that Corydalis can cause severe liver injury. Hoping follow-up blood work shows my liver is healing and the ALT levels are returning to normal as I now deal with the gastritis these pills likely caused.

- Rika (Wolf) Beckley — Yes! I started taking 1906 Midnight about a year ago. (My first time taking an edible/THC product). The DID help me sleep. Unfortunately during my annual exam last year, blood work showed insanely high liver enzymes for the first time ever. It took months of blood work, and a liver specialist (and a lot of out of pocket medical bills) to finally figure out that it was this product causing "drug induced liver injury." Ugh! Ironically all that stress caused me many more sleepless nights and damage than the drops initially helped. I hope that this company addresses this issue before other suffer as I have.

### Comments from Reddit.com[22]

- u/sethrogenssausage — I've been taking 1 1906 midnight almost every night and recently discovered liver damage. My doctors weren't sure of the cause, until i mentioned I took midnights. The natural ingredient, Corydalis, is know to cause liver damage. Then found out another one of my friends was getting biopsies on their liver to figure out what was happening to them, only to discover they were also taking 1906s.

- appletonian — I've just made the connection myself after some blood work showed high enzymes as well. Bad news. Too bad, this really helped with sleep.

- clearlykate — I too suffered from liver damage from Midnight Drops, after using occasionally for only 6 weeks. Fortunately I had routine blood work done and found scary high liver enzymes. I am now going without even a Motrin for 6 weeks to bring the levels down. You don't have to be a drinker to suffer this damage. I also spoke with CEO, he knows what is happening. If this was Pharma there would be a black box warning or perhaps they'd have to pull the product.

---

[22] Reddit.com/r/trees/comments/t3wvjz/warning_1906_midnights_caused_liver_damage_for_me/

- Flashy-Avocado-1631 — That is crazy! I was taking them everyday and had some liver lab tests come back bad as well! I had never had liver issues. Dispensaries would be educating their customers that bought these. I bet this happened to a lot of folk.

### Comments from Weedmaps.com[23]

- msags321 — I loved this product. Slept like a baby. I'm a healthy, active 50+ year old who has been using this every night for a month or so. In my annual physical, my blood test came back with liver enzymes over 300 - the normal level is 20 or so. After some research, It is my belief and my doctors belief that the Active ingredient in Midnight has been damaging my liver. Corydalis has been known to cause liver toxicity due to the alkaline THP. Here I just thought it was an edible, and the THC/CBD combo was helping me sleep. Nope- it's the ancient Chinese herb corydalis, well known for its effects- and it's potential toxicity. This is toxic!! Avoid this supplement like the plague- it could hospitalize or kill you. THIS PRODUCT SHOULD BE PULLED FROM THE MARKET. This experience has opened my eyes.

- MerlyAppleSauce — I like many people struggle with sleep and turned to these pills. A couple friends of mine had tried them and the reviews are mostly positive. After taking them on average 2X/month on rough nights -- I ended up in the hospital with severe drug induced liver injury from the Chinese Herb Corydalis found in these pills. As these are unregulated, BEWARE. I am unable to test it the other way, but let's just say it wasn't out of question I could have had complete liver failure or needed a transplant for an otherwise healthy liver -- had I taken more of these. I also never took more than 1 and shudder to think what 2 pills at once could have

---

[23] https://weedmaps.com/brands/1906-new-highs/products/1906-new-highs-midnight-drops-100-mg-thc-100-mg-cbd/reviews?filter%5Brating%5D%5Bmax%5D=1.5&filter%5Brating%5D%5Bmin%5D=1

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

done to me. They could have potentially been fatal. I am a healthy 35 year old women who exercises, eats mostly fresh fruit and vegetables, and hardly drinks. Please Please think twice before taking these pills, check with your doctor, do your research. The last few weeks have been terrifying. It's only my intention to protect others.

- loneill420 — The main ingredient, corydalis, is KNOWN to cause liver damage, yet there are no warnings about it on their packaging or website. After spending tons on blood tests and ultrasounds to see the cause and extent of my liver damage, doctors came to the conclusion that it was from corydalis in midnights. They help you sleep, but proceed with caution and definitely ask your doctor if it's safe for you. Just google the ingredient corydalis and you'll see.

### Comments from Weedhacker.net[24]

- Steve Horelick — Beware! The Chinese herb Corydalis is the main ingredient (100mg/pill). This herb is extremely toxic to the liver and gave me acute, severe drug induced hepatitis. I had a liver biopsy to discover this and was sick for 2 months. This is a very dangerous, unregulated supplement. Read this: https://www.verywellhealth.com/corydalis-benefits-4589168.

- Lo — Same thing as the other review!!! This caused liver damage for me! Avoid it. Stick to melatonin.

---

[24] https://weedhacker.net/2021/01/13/1906-drops-midnight/

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

*Comments from Iheartjane.com[25]*

- e****c — I spent the night in the Emergency Room after taking this product. This product almost killed me. Shame on 1906 and Windy City for giving buyers the impression that this product only contains THC and CBD as the label states. The label does not state that is contains other ingredients with some of the ingredients known to cause liver damage. This product should be pulled from the shelves immediately.

## PLAINTIFF PURCHASED THE PRODUCTS AND SUFFERED ECONOMIC AND PERSONAL INJURIES AS A RESULT

30. Plaintiff purchased the Products on many occasions from a dispensary in Chicago, Illinois for approximately $30.00 per container, before tax.

31. Plaintiff began purchasing the Products in June 2021 and used them regularly. For the first three weeks, Plaintiff consumed one pill per night. Thereafter, Plaintiff consumed one pill before bedtime approximately 3 times per week until October 2021.

32. Plaintiff read and reviewed the Products' label representations, Defendant's representations regarding the Products on Defendant's website, and Defendant's marketing and advertising material and information concerning the Products, and relying upon them, Plaintiff reasonably believed that the Products were safe, effective, and appropriate for intended uses as a sleep aid. Plaintiff consumed the Products to help him fall asleep. At all times, Plaintiff used the Products for their intended uses, at recommended frequencies, and in recommended quantities. Plaintiff never consumed more than one pill at a time.

---

[25] https://www.iheartjane.com/products/209772/1906-midnight-drops-20pk-100mg-cbd-100mg-thc

33.     On September 23, 2021, Plaintiff received the results of blood tests conducted as part of his regular annual health checkup. All test results were normal, except certain lab tests showed levels of Plaintiff's liver enzymes that were extremely high. Plaintiff's comprehensive metabolic panel of his blood serum or plasma showed levels of alanine aminotransferase ("ALT") of 994 units per liter. Such levels of ALT are orders of magnitude greater than the normal range of 11 - 51 units per liter. ALT levels in a person's blood can increase when their liver is damaged, so healthcare providers often use an ALT blood test to help assess the health of the liver.

34.     In addition, Plaintiff's blood tests registered levels of aspartate aminotransferase ("AST") of 361 units per liter. This number is well in excess of the normal range of 13 - 30 units per liter for AST. Increases in AST are also signs of liver damage.

35.     Plaintiff had not mentioned to his healthcare provider that he used the Products, so no connection between the Products and the elevated ALT and AST levels was made by his healthcare provider at that time.

36.     Prior to these lab tests, no healthcare provider ever raised any issues with Plaintiff regarding his liver or liver enzymes, such as ALT or AST.

37.     Based on the high levels of ALT and AST, Plaintiff's healthcare provider ordered further studies and tests. In early October 2021, a second blood sample was drawn and Plaintiff's ALT was even higher. This time, Plaintiff's ALT was 1,208 units per liter. In addition, Plaintiff's AST level was still extremely elevated at 316 units per liter.

38.     Plaintiff's extremely high levels of ALT and AST are consistent with liver damage that Plaintiff sustained as a result of his consumption of the Products. But for his consumption of the Products, Plaintiff would not have had elevated levels of these enzymes and would not have suffered any liver damage.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

39.     Plaintiff does not take any other prescription medications or treatments.

40.     Plaintiff has only occasionally taken over-the-counter medication or treatments according to their recommended uses prior to September 23, 2021.

41.     Plaintiff stopped purchasing and using the Products after he received the results of the second blood test. Because Plaintiff did not drink alcohol, was not obese, and lived a healthy lifestyle, he suspected (but did not know) that the abnormally high levels of his liver enzymes might be attributed to his use of the Products. At that time, he was unaware that he was just one of many users of the Products who were suffering liver injuries. Other than the Products, there were no other potential contributors or causes of Plaintiff's abnormally elevated liver enzymes.

42.     Had Plaintiff known that the Products contained ingredients that caused liver damage when used as directed, he would not have purchased or consumed the Products.

## CLASS ALLEGATIONS

43.     **Multistate Purchase Class**: Plaintiff brings this action pursuant to 735 ILCS 5/2-801 seeking damages on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons who purchased 1906 Edibles Midnight Drops in Arizona, Colorado, Illinois, Massachusetts, Michigan, and Oklahoma.

44.     **Multistate Consumption Class:**[26] Plaintiff brings this action pursuant to 735 ILCS 5/2-801 seeking damages on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons who consumed 1906 Edibles Midnight Drops in Arizona, Colorado, Illinois, Massachusetts, Michigan, and Oklahoma.

---

[26] The Multistate Purchase Class and Multistate Consumption Class will collectively be referred to as the "Multistate Classes."

FILED DATE: 6/29/2022 10:30 AM  2022CH06258

45.    **Illinois Purchase Subclass**: Plaintiff brings this action pursuant to 735 ILCS 5/2-801 seeking damages on behalf of himself and an Illinois Subclass of similarly situated individuals, defined as follows:

> All persons who purchased 1906 Edibles Midnight Drops in Illinois.

46.    **Illinois Consumption Subclass**:[27] Plaintiff brings this action pursuant to 735 ILCS 5/2-801 seeking damages on behalf of himself and an Illinois Subclass of similarly situated individuals, defined as follows:

> All persons who consumed 1906 Edibles Midnight Drops in Illinois.

47.    Excluded from the Classes[28] are: (1) Defendant, Defendant's officers, directors, agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' agents, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from a particular Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

48.    **Numerosity**: Upon information and belief, the Classes are so numerous that joinder of all individual Class members would be impracticable. The exact number of Class members is presently unknown and can only be ascertained through discovery. However, Plaintiff believes that each Class consists of thousands of individuals, as the Products are the best-selling variety of Defendant's drops. The Products are offered for sale in more than 100 retail locations within

---

[27] The Illinois Purchase Subclass and Illinois Consumption Subclass will collectively be referred to as the "Illinois Subclasses."

[28] The Multistate Classes and Illinois Subclasses will collectively be referred to as the "Class" or "Classes."

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

Illinois alone. Additionally, the Multistate Classes consist of members from six states in disparate geographic regions, making joinder impractical.

49.   **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiff and the members of the Classes. Those common questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to, the following:

a.   Whether Defendant made misrepresentations and omissions regarding whether the Products contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as directed;

b.   Whether Defendant made omissions regarding whether the Products cause liver damage;

c.   Whether Defendant knew and intended that Plaintiff and Class members would rely on its misrepresentations and omissions regarding the Products;

d.   Whether Defendant knew or should have known that the Products contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as directed;

e.   Whether Defendant knew or should have known that the Products caused liver damage;

f.   Whether Defendant's conduct violated the Illinois Cannabis Regulation and Tax Act;

g.   Whether Defendant's conduct violated the Illinois Food, Drug and Cosmetic Act;

h.   Whether Defendant's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, and similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma;

i.   Whether Defendant breached the implied warranty of merchantability;

j.   Whether the Products are defective;

k.   Whether Defendant owed duties to Plaintiff and Class members to design, formulate, manufacture, promote, market, distribute, and sell Products that are safe and fit for human consumption, and not contaminated with harmful levels of Corydalis and THP;

l.     Whether Defendant breached duties of care it owed to Plaintiff and Class members in one or more of the following ways: manufacturing, marketing, distributing, and selling Products containing unreasonable and harmful levels of Corydalis and THP; manufacturing, marketing, distributing, and selling Products containing unreasonable and harmful levels of Corydalis and THP, and concealing or failing to disclose that such levels are harmful and pose unreasonable health risks; manufacturing, marketing, distributing, and selling Products containing ingredients that are unsafe for human consumption; marketing and advertising the Products by conveying health, medicinal, and therapeutic claims; failing to promptly notify Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members of the unreasonable and harmful levels of Corydalis and THP within a reasonable time after discovering facts that would place upon Defendant a duty to warn or recall the Products; and failing to promptly recall the Products, and continuing to advertise the Products as healthy, all natural, plant-based alternatives to safer and healthier sleep aids once the duty of care required that Defendant perform such a recall; and

m.    Whether Defendant was unjustly enriched by its misconduct.

50.    **Typicality**: Plaintiff's claims are typical of the claims of the proposed Classes. All claims in this matter are based on the same legal and factual issues, as they arise out of Defendant's manufacture, marketing, distribution, and sale of the Products. Plaintiff and Class members were all exposed to the representations and omissions at issue, and as a result, purchased and/or consumed the Products and were subjected to Defendant's uniform course of conduct.

51.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, he is committed to the vigorous prosecution of this action, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

52.    **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual Class members to obtain effective relief because the damages the suffered are likely to be relatively small, especially in comparison to the

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

costs to the parties and the court system of individually pursuing litigation based on Defendant's actions. If Class members were to pursue individual litigation, the multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies at issue in the case. A class action, on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single Court, and would result in reduced time, effort and expense for all parties and the Court, and ultimately, the uniformity of decision.

## COUNT I
### Violation of the Illinois Food, Drug and Cosmetic Act
### (410 ILCS 620/1, *et seq.*)
### (On behalf of Plaintiff and the Illinois Subclasses)

53.     Plaintiff incorporates by reference the allegations in paragraphs 1–52 as if fully set forth herein.

54.     At all relevant times, the Illinois Food, Drug & Cosmetic Act ("IFDCA"), 410 ILCS 620/1, *et seq.*, was in full force and effect.

55.     The IFDCA prohibits the manufacture, sale, delivery, holding, or offering for sale of any drug that is adulterated or misbranded; the adulteration or misbranding of any drug; the receipt in commerce of any drug that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise. 410 ILCS 620/3–3.3.

56.     The IFDCA prohibits the dissemination of any false advertisement. 410 ILCS 620/3.5.

57.     The Products are "drugs" within the meaning of the IFDCA because they are articles "intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man," or articles "intended to affect the structure or any function of the body of man." 410 ILCS 620/2.4(a)(2), (4).

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

58.     If an article is alleged to be misbranded because the labeling is misleading or if an advertisement is alleged to be false because it is misleading, then in determining whether the labeling or advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound or any combination thereof, but also the extent to which the labeling or advertisement fails to reveal material facts in the light of such representations or material facts with respect to consequences which may result from the use of the article to which the labeling or advertisement relates under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions of use as are customary or usual. 410 ILCS 620/2.11.

59.     Under the IFDCA, a drug is "adulterated" if, *inter alia*, (a) "it has been produced, prepared, packed, or held under unsanitary conditions whereby it may have been contaminated with filth or whereby it may have been rendered injurious to health," (b) "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of the Act as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess," or (c) "any substance has been (1) mixed or packed therewith so as to reduce its quality or strength, or (2) substituted wholly or in part therefor." 410 ILCS 620/14(a)(2)(A), (a)(2)(B), (d).

60.     The Products were and are misbranded and adulterated because they contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as advertised, intended, and directed, and the Products' labeling and advertisements fail to reveal those material facts.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

61.    Defendant's practice of manufacturing, advertising, marketing, distributing, delivering, and selling adulterated and misbranded Products violated the IFDCA and created a risk to public health, including the health of Plaintiff and members of the Illinois Subclasses.

62.    Plaintiff and Illinois Subclass members may enforce Defendant's violations of the IFDCA because the primary purpose of the IFDCA is to protect public health, and compliance with laws affecting the health of the community is a public concern of the highest magnitude. Implying a private right of action under the IFDCA is consistent with the underlying purpose of the IFDCA. In addition, Plaintiff and Illinois Subclass members are in the class of persons the statute was enacted to protect and their injuries were the very kind of harms that the statute was enacted to prevent.

63.    As a direct and proximate result of Defendant's violations of the IFDCA, Plaintiff and Illinois Subclass members suffered economic damages in the form of money spent for worthless and harmful Products that were misbranded and adulterated.

64.    As a direct and proximate result of Defendant's unlawful acts described herein, Plaintiff and Illinois Consumption Subclass members also sustained personal injuries and incurred medical expenses and healthcare costs, and will have to do so in the future for medical monitoring, medications, and other treatment associated with reducing, alleviating, and mitigating the toxic effects of consuming the Products, as well as mental anguish, annoyance, inconvenience, pain and suffering, and emotional distress.

65.    But for Defendant's misrepresentations and omissions described herein, Plaintiff and members of the Illinois Subclasses would not have purchased or consumed the Products. Further, had Plaintiff and Illinois Consumption Subclass members known that the Products contained levels of Corydalis extract and THP that were harmful and unsafe for human

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

consumption when used as directed, they would not have consumed the Products and would not have sustained any personal injuries or expenses associated with those injuries.

66.     Because Plaintiff and Illinois Consumption Subclass members developed or face an increased risk of developing other diseases and conditions, Plaintiff and Illinois Consumption Subclass members seek an order requiring Defendant to pay their future medical monitoring and treatment costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Illinois Subclasses, prays for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Illinois Subclasses;

B.     Designating Plaintiff as representative of the Illinois Subclasses, and his undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiff and the Illinois Subclasses, and against Defendant;

D.     Awarding Plaintiff and the Illinois Subclasses actual and punitive damages, interest, and reasonable attorneys' fees and costs;

E.     Ordering Defendant to pay to pay future medical monitoring and treatment costs for Plaintiff and Illinois Consumption Subclass members; and

F.     Granting all such further and other relief as the Court deems just and appropriate.

## COUNT II
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
(815 ILCS 505/1, *et seq.*), and Similar Laws in
Arizona, Colorado, Massachusetts, Michigan, and Oklahoma
(On behalf of Plaintiff and All Classes)**

67.     Plaintiff incorporates by reference the allegations in paragraphs 1–66 as if fully set forth herein.

68.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services. The similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma provide the same protection to consumers. Ariz. Rev. Stat. § 44-1521, *et seq.*; Colo. Rev. Stat. § 6-1-101, *et seq.*; Mass. Gen. Laws ch. 93A, *et seq.*; Mich. Comp. Laws § 445.901, *et seq.*; 78 Okla. Stat. § 51, *et seq.*

69.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Illinois Uniform Deceptive Trade Practices Act. 815 ILCS 505/2. The similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma prohibit the same deceptive, unlawful, unfair, or fraudulent business acts or practices. Ariz. Rev. Stat. § 44-1522; Colo. Rev. Stat. § 6-1-105; Mass. Gen. Laws ch. 93A, §2; Mich. Comp. Laws § 445.903; 78 Okla. Stat. § 53.

70.     The ICFA, and similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma, apply to Defendant's acts as described herein because they apply to transactions involving the sale of goods or services to consumers.

71.     Defendant is a "person" within the meaning of section 505/1(c) of the ICFA, and similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma. Ariz. Rev. Stat. § 44-1521(6); Colo. Rev. Stat. § 6-1-102(6); Mass. Gen. Laws ch. 93A, §1(a); Mich. Comp. Laws § 445.902(d); 78 Okla. Stat. § 52(8).

72.     The Products constitute "merchandise," "goods," or "services," and the manufacturing, marketing, advertising, distribution, and sale of the Products is within the meaning

FILED DATE: 6/29/2022 10:30 AM 2022CH06258

of "trade" or "commerce" under the ICFA, 815 ILCS 505/1(b), and the similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma. Ariz. Rev. Stat. § 44-1521(5), (7); Colo. Rev. Stat. § 6-1-105(2), (10); Mass. Gen. Laws ch. 93A, §1(b); Mich. Comp. Laws § 445.902(g); 78 Okla. Stat. § 53.

73.    Defendant conveyed false, misleading, and deceptive representations and omissions of material fact with regard to the Products on its website, https://1906newhighs.com, in its advertisements, and on the Products' packaging.

74.    Defendant falsely and misleadingly represents that the Products are safe and effective when they are not. *See, e.g., supra* ¶¶ 11, 14. The Products contain levels of Corydalis extract and THP that are harmful and unsafe for human consumption when used as advertised and intended.

75.    Defendant falsely advertised the Products and made health, medicinal, or therapeutic claims about cannabis or cannabis-infused products in violation of the Cannabis Act, 410 ILCS 705/55-20(a)(1), (5). Defendant marketed the Products as an all natural, plant-based sleep aid, and executed a marketing and product design strategy that closely mimicked pharmaceuticals, including calling the Products medicine, packaging them in a cylindrical container resembling a pill container, and making the Products as drops that look, feel, and are consumed like pills. Defendant's website claims that the Products "target[] body pain and tension, including acute, inflammatory, and neuropathic pain." *See, e.g., supra*, ¶¶ 11–14. In addition, Defendant's website touted the Products as a natural alternative to other sleep aids, calling the Products "pharma-grade," and Barsoom bragged that Defendant "moved cannabis into the medicine cabinet." *See e.g., supra*, ¶¶ 12, 14.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

76.     Defendant's distribution and placement of the Products for sale in licensed dispensaries necessarily implies a representation that the Products are safe for human consumption when used as advertised and directed. Such representations are false, misleading, and deceptive because the Products are harmful and unsafe for human consumption when used as advertised and directed.

77.     Defendant omitted the material fact that consumption of Corydalis and THP have caused liver damage, and may cause liver damage when used as directed.

78.     Defendant's omission of material facts concerning Corydalis and THP in the Products rendering them harmful and unsafe for human consumption when used as directed was deceptive when considered alongside the disclaimers regarding the risks to health of cannabis that are displayed on the Products' packaging. The Products meticulously note certain risks of the Products while omitting to mention the well-documented causal link between Corydalis, its active constituent THP, and liver injuries. For instance, the Products' information sheet states: "never consume more than 2 drops of Midnight at a time (or per day)"; "do not consume in conjunction with alcohol, or if you are taking other sedatives"; "its use can impair cognition and may be habit forming"; "this product should not be used by pregnant or breastfeeding women"; and "this product contains cannabis, and intoxication following use may be delayed 2 or more hours." In light of these warnings, Defendant's silence regarding the acute and unreasonable risks of the Products to Plaintiff's and Class members' liver health is misleading and deceptive.

79.     Defendant's misrepresentations and omissions set forth above were unfair or deceptive acts and practices in violation of the ICFA. *E.g.*, 815 ILCS 510/2(a)(5) (representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or

27

connection that he or she does not have"); 815 ILCS 510/2(a)(6) (representing "that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand"); 815 ILCS 510/2(a)(7) (representing "that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another").

80.     Defendant's misrepresentations and omissions set forth above were unfair or deceptive acts and practices in violation of similar laws in Arizona, Colorado, Massachusetts, Michigan, and Oklahoma. *See* Ariz. Rev. Stat. § 44-1522 ("The act, use, or employment by any persons of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby is declared to be an unlawful practice."); Colo. Rev. Stat. § 6-1-105(1)(e), (u), (sss) ("A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person . . . either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property" or "fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."); Mass. Gen. Laws ch. 93A, §2 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."); Mich. Comp. Laws § 445.903 ("Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful."); 78 Okla. Stat. § 53(5), (7) ("A person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person . . . knowingly makes

a false representation as to the characteristics, ingredients, uses, benefits or quantities or goods or services" or the person "represents that goods or services are a particular standard, quality, or grade . . . if they are another.").

81. Defendant's practice of manufacturing, marketing, advertising, distributing, and selling Products which contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as directed was an unfair practice prohibited by the aforementioned consumer protection laws because such practice was immoral, unethical, oppressive, unscrupulous, and violated statutes and regulations intended to protect the public, such as the federal Food, Drug and Cosmetic Act and the IFDCA, which prohibit false advertising and selling adulterated and misbranded drugs. *See* 21 U.S.C. §§ 321(g)(1), 351, 352; 410 ILCS 620/3 (incorporating 410 ILCS 620/3.1-3.5).

82. But for Defendant's misrepresentations and omissions described herein, Plaintiff and Class members would not have purchased or consumed the Products.

83. Defendant intended that Plaintiff and Class members rely on its deceptive misrepresentations and omissions of material fact.

84. By employing the misrepresentations and omissions described herein, Defendant deceived Plaintiff and Class members into purchasing the Products that they would not have purchased had they known the truth.

85. Defendant knew or consciously disregarded the substantial risk that the Products contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as advertised and directed when it conceived, developed, and disseminated the false, misleading, and deceptive representations and omissions concerning the Products, and when Plaintiff and Class members purchased or consumed the Products.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

86.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and Class members suffered economic damages in the form of money spent to purchase Products from Defendant. Plaintiff and Class members would not have spent any money to purchase the Products if Defendant had not unlawfully and deceptively advertised and sold the Products as alleged herein. The Products are worthless and Plaintiff and Class members are entitled to a refund of the full purchase price of the Products, among other damages.

87.     Further, had Plaintiff and Multistate Consumption Class members known that the Products contained levels of Corydalis extract and THP that were harmful and unsafe for human consumption when used as directed, they would not have consumed the Products and would not have sustained any personal injuries or expenses associated with those injuries.

88.     By employing the misrepresentations and omissions described herein, Defendant misled and deceived Plaintiff and Multistate Consumption Class members into consuming the Products and suffering personal injuries, including liver damage, abdominal pain, jaundice, fatigue, nausea, and headaches.

89.     Plaintiff and Multistate Consumption Class members also incurred medical expenses and healthcare costs, and will have to do so in the future for medical monitoring, medications, and other treatment associated with reducing, alleviating, and mitigating the toxic effects of consuming the Products, as well as mental anguish, annoyance, inconvenience, pain and suffering, and emotional distress.

90.     As a direct and proximate result of Defendant's unlawful conduct alleged herein, Plaintiff and Class members suffered economic and personal injury damages.

91.     Because Plaintiff and Multistate Consumption Class members developed or face an increased risk of developing other diseases and conditions, Plaintiff and Multistate Consumption

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

Class members seek an order requiring Defendant to pay their future medical monitoring and treatment costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, prays for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Classes;

B. Designating Plaintiff as representative of the Classes, and his undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiff and the Classes, and against Defendant;

D. Awarding Plaintiff and the Classes actual and punitive damages, interest, and reasonable attorneys' fees and costs;

E. Ordering Defendant to pay to pay future medical monitoring and treatment costs for Plaintiff and Multistate Consumption Class members;

F. Enjoining Defendant from selling the Products in their current formulation in Arizona, Colorado, Illinois, Massachusetts, Michigan, and Oklahoma; and

G. Granting all such further and other relief as the Court deems just and appropriate.

## **COUNT III**
### **Breach of Implied Warranty of Merchantability**
### **(On behalf of Plaintiff and All Classes)**

92. Plaintiff incorporates by reference the allegations in paragraphs 1–52 as if fully set forth herein.

93. A warranty that the Products shall be merchantable is implied in a contract for their sale. To be merchantable, among other things, the Products "must be at least such as . . . pass without objection in the trade under the contract description," "are of fair average quality within the description," and are "fit for the ordinary purposes for which such goods are used." Uniform Commercial Code § 2-314(2)(a)-(c).

FILED DATE: 6/29/2022 10:30 AM 2022CH06258

94.     Defendant's manufacture, distribution, and sale of the Products was subject to an implied warranty that the Products would pass without objection, be of fair average quality, fit for the ordinary purposes, safe for human consumption, not misbranded, not adulterated, and not contain levels of Corydalis and THP that were harmful in the recommended dosage and under ordinary and intended uses.

95.     In breach of those implied warranties, Defendant manufactured, distributed, and sold the Products that were misbranded, adulterated, would not pass without objection, were not of fair and average quality, and were not fit for ordinary uses such as human consumption.

96.     Plaintiff and Class members purchased and consumed the Products in reliance upon Defendant's implied warranties.

97.     Had Plaintiff and Class members known that the Products did not conform to the implied warranties of merchantability, they would not have purchased or consumed the Products.

98.     As a direct and proximate result of Defendant's breaches of the implied warranties of merchantability, Plaintiff and all Class members paid money for Products that they would not have paid, and Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members sustained personal injuries and incurred medical expenses and healthcare costs, and will have to do so in the future for medical monitoring, medications, and other treatment associated with reducing, alleviating, and mitigating the toxic effects of consuming the Products, as well as mental anguish, annoyance, inconvenience, pain and suffering, and emotional distress.

99.     Because Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members developed or face an increased risk of developing other diseases and conditions, Plaintiff, Multistate Consumption Class members, and Illinois Consumption

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

Subclass members seek an order requiring Defendant to pay their future medical monitoring and treatment costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, prays for an Order as follows:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Classes;

B.   Designating Plaintiff as representative of the Classes, and his undersigned counsel as Class Counsel;

C.   Entering judgment in favor of Plaintiff and the Classes, and against Defendant;

D.   Awarding Plaintiff and the Classes actual and punitive damages, interest, and reasonable attorneys' fees and costs;

E.   Ordering Defendant to pay to pay future medical monitoring and treatment costs for Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members; and

F.   Granting all such further and other relief as the Court deems just and appropriate.

## **COUNT IV**
### **Strict Product Liability**
**(On behalf of Plaintiff, the Multistate Consumption Class,**
**and Illinois Consumption Subclass)**

100.   Plaintiff incorporates by reference the allegations in paragraphs 1–52 as if fully set forth herein.

101.   Defendant is the manufacturer, marketer, distributor, and seller of the Products.

102.   The Products manufactured, marketed, distributed, and sold by Defendant uniformly contained unreasonably dangerous and harmful levels of Corydalis and THP when the Products left Defendant's custody and control. Moreover, the packaging of the Products sealed and contained the Products from the time the Products left Defendant's facilities until Plaintiff,

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

Multistate Consumption Class members, and Illinois Consumption Subclass members consumed them.

103.    Defendant failed to warn or disclose to Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members that the Products contained harmful levels of Corydalis and THP.

104.    The Products obtained by Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members were in a defective and unreasonably dangerous condition when they left Defendant's custody and control.

105.    Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members were injured by their consumption of the Products.

106.    As a direct and proximate result of Defendant's manufacture, marketing, distribution, and sale of inherently dangerous and defective Products, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members suffered harm by ingesting toxic levels of Corydalis and THP that caused personal injuries.

107.    As a direct and proximate result of Defendant's failure to warn or disclose to Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members that the Products were unreasonably dangerous and harmful, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members suffered harm by ingesting toxic levels of Corydalis and THP that caused personal injuries.

108.    Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members are at risk of future harm, as they must treat, alleviate, and mitigate the harmful levels of toxins in their systems.

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

109.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members also incurred medical expenses and healthcare costs, and will have to do so in the future for medical monitoring, medications, and other treatment associated with reducing, alleviating, and mitigating the toxic effects of consuming the Products, as well as mental anguish, annoyance, inconvenience, pain and suffering, and emotional distress.

110.    Because Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members developed or face an increased risk of developing other diseases and conditions, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members seek an order requiring Defendant to pay their future medical monitoring and treatment costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Multistate Consumption Class and Illinois Consumption Subclass, prays for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Multistate Consumption Class and Illinois Consumption Subclass;

B.    Designating Plaintiff as representative of the Multistate Consumption Class and Illinois Consumption Subclass, and his undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass, and against Defendant;

D.    Awarding Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass actual and punitive damages, interest, and reasonable attorneys' fees and costs;

E.    Ordering Defendant to pay to pay future medical monitoring and treatment costs for Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass; and

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

F.      Granting all such further and other relief as the Court deems just and appropriate.

## COUNT V
### Negligence
**(On behalf of Plaintiff, the Multistate Consumption Class,
and the Illinois Consumption Subclass)**

111.    Plaintiff incorporates by reference the allegations in paragraphs 1–52 as if fully set forth herein.

112.    Defendant, directly or indirectly, caused the Products to be manufactured, marketed, promoted, distributed, sold, purchased, and consumed by Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members.

113.    At all relevant times, Defendant owed a duty to Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members to exercise reasonable care in designing, formulating, marketing, supplying, packaging, promoting, and selling the Products, including a duty to prevent harmful levels of Corydalis and THP from being in the Products and causing personal injuries to Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members.

114.    Defendant knew or should have known that Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members would be harmed as a result of their ingestion of harmful levels of Corydalis and THP in the Products.

115.    Defendant breached its duties to design, formulate, manufacture, promote, market, distribute, and sell Products that are safe and fit for human consumption, and are not contaminated with harmful levels of Corydalis and THP, in one or more of the following ways:

- Manufacturing, marketing, distributing, and selling Products containing unreasonable and harmful levels of Corydalis and THP;

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

- Manufacturing, marketing, distributing, and selling Products containing unreasonable and harmful levels of Corydalis and THP, and concealing or failing to disclose that such levels are harmful and pose unreasonable health risks;

- Manufacturing, marketing, distributing, and selling Products containing ingredients that are unsafe for human consumption;

- Marketing and advertising the Products by conveying health, medicinal, and therapeutic claims;

- Failing to promptly notify Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members of the unreasonable and harmful levels of Corydalis and THP within a reasonable time after discovering facts that would place upon Defendant a duty to warn or recall the Products; and

- Failing to promptly recall the Products, and continuing to advertise the Products, implicitly and expressly, as healthy, all natural, plant-based alternatives to safer and healthier sleep aids once the duty of care required that Defendant perform such a recall. *See e.g., supra,* ¶¶ 11, 13, 14.

116.    There was no utility to Defendant's conduct. Defendant had the ability, means, and duty to design, manufacture, distribute, and sell Products without harmful levels of Corydalis and THP. The risks and dangers of Defendant's actions outweighed any arguable benefits. Practical alternatives to the Products' harmful levels of Corydalis and THP existed and should have been implemented instead. For example, Defendant could have reduced the levels of Corydalis and THP in the Products to safe doses, advised users to use the Products with a reduced frequency to reduce

FILED DATE: 6/29/2022 10:30 AM 2022CH06258

the levels of Corydalis and THP to safe levels, included additional ingredients or manufacturing processes in the Products to counteract and mitigate the effects of the Corydalis and THP in the Products, used a different formulation of Corydalis that is safe for consumption, and/or removed Corydalis and THP from the Products altogether, or as necessary to adhere to reasonable commercial practices and comply with Defendant's duty to manufacture, market, distribute, and sell Products that are safe for human consumption.

117. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members also incurred medical expenses and healthcare costs, and will have to do so in the future for medical monitoring, medications, and other treatment associated with reducing, alleviating, and mitigating the toxic effects of consuming the Products, as well as mental anguish, annoyance, inconvenience, pain and suffering, and emotional distress.

118. Because Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members developed or face an increased risk of developing other diseases and conditions, Plaintiff, Multistate Consumption Class members, and Illinois Consumption Subclass members seek an order requiring Defendant to pay their future medical monitoring and treatment costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Multistate Consumption Class and Illinois Consumption Subclass, prays for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Multistate Consumption Class and Illinois Consumption Subclass;

B. Designating Plaintiff as representative of the Multistate Consumption Class and Illinois Consumption Subclass, and his undersigned counsel as Class Counsel;

FILED DATE: 6/29/2022 10:30 AM 2022CH06258

C.    Entering judgment in favor of Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass, and against Defendant;

D.    Awarding Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass actual and punitive damages, interest, and reasonable attorneys' fees and costs;

E.    Ordering Defendant to pay to pay future medical monitoring and treatment costs for Plaintiff, the Multistate Consumption Class, and Illinois Consumption Subclass; and

F.    Granting all such further and other relief as the Court deems just and appropriate.

**COUNT VI**
**Unjust Enrichment**
**(On behalf of Plaintiff, the Multistate Purchase Class,**
**and Illinois Purchase Subclass)**

119.    Plaintiff incorporates by reference the allegations in paragraphs 1–52 as if fully set forth herein.

120.    Plaintiff pleads this Count VI in the alternative to Counts I through V.

121.    Defendant has been unjustly enriched to the detriment of Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members, as a result of Defendant's unlawful and wrongful retention of money conferred by them to purchase the Products, which were harmful to their health and, as a result, worthless.

122.    Defendant's unlawful and wrongful acts, as alleged herein, enabled Defendant to unlawfully receive monies it would not have otherwise obtained, as Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members would not have purchased the Products had they known of the Products' ingredients and health risks.

123.    Defendant has knowingly accepted and retained the benefits conferred by Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members.

FILED DATE: 6/29/2022 10:30 AM    2022CH06258

124.   Defendant's retention of the benefits would be against fundamental principles of justice, equity, and good conscience.

125.   Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members seek to disgorge Defendant's unlawfully retained money and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the money and benefits conferred by Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members.

126.   Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members are entitled to the imposition of a constructive trust upon Defendant, such that Defendant's unjustly retained money and other benefits are distributed equitably by the Court to and for the benefit of Plaintiff, Multistate Purchase Class members, and Illinois Purchase Subclass members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Multistate Purchase Class and Illinois Purchase Subclass, prays for an Order as follows:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action established by 735 ILCS 5/2-801, and certifying the Multistate Purchase Class and Illinois Purchase Subclass;

B.   Designating Plaintiff as representative of the Multistate Purchase Class and Illinois Purchase Subclass, and his undersigned counsel as Class Counsel;

C.   Entering judgment in favor of Plaintiff, the Multistate Purchase Class, and Illinois Purchase Subclass, and against Defendant;

D.   Awarding Plaintiff, the Multistate Purchase Class, and Illinois Purchase Subclass restitution and disgorgement of the money and benefits they conferred upon Defendant;

E.   Imposing a constructive trust in favor of Plaintiff, the Multistate Purchase Class, and Illinois Purchase Subclass over the money and benefits Defendant has unlawfully retained through its unjust conduct;

FILED DATE: 6/29/2022 10:30 AM   2022CH06258

F.     Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Plaintiff GEORGE TSITIRIDIS, individually, and on behalf of all others similarly situated,

By:   /s/ Thomas A. Zimmerman, Jr.    

        Thomas A. Zimmerman, Jr.
        *tom@attorneyzim.com*
        Sharon A. Harris
        *sharon@attorneyzim.com*
        Matthew C. De Re
        *matt@attorneyzim.com*
        Jeffrey D. Blake
        *jeff@attorneyzim.com*
        ZIMMERMAN LAW OFFICES, P.C.
        77 W. Washington Street, Suite 1220
        Chicago, Illinois 60602
        (312) 440-0020 telephone
        (312) 440-4180 facsimile
        www.attorneyzim.com
        Firm ID No. 34418

        Counsel for the Plaintiff, Classes, and Subclasses